[S.F. No. 22800. In Bank. Mar. 1, 1973.]

GERALD B. AMES et al., Petitioners, v.
THE STATE BAR OF CALIFORNIA, Respondent.

912

**COUNSEL**

Trepel, Gingerich & Hoss and Anthony J. Trepel for Petitioners.

F. LaMar Forshee, Herbert M. Rosenthal and Christopher M. Reuss for Respondent.

## OPINION

**THE COURT.**—This is a proceeding to review a recommendation of the Disciplinary Board of the State Bar (Board) that petitioners be privately reproved.

Petitioner James Edwin Bean, Jr., was admitted to practice in 1948; petitioner Gerald B. Ames in 1962. Neither petitioner has been involved in prior disciplinary proceedings.

In 1968 petitioners were charged with having wilfully violated their oath and duties as attorneys (Bus. & Prof. Code, §§ 6103, 6067, 6068), the commission of acts involving moral turpitude, dishonesty and corruption (Bus. & Prof. Code, § 6106), and with a wilfull violation of rules 4[1] and 8[2] of the Rules of Professional Conduct. After a hearing the local administrative committee found that petitioners had violated rule 4 by acquiring an interest adverse to their clients in purchasing a promissory note secured by a first deed of trust on certain real property at a time when their client was the holder of a promissory note secured by a second deed of trust on the same property, and that petitioners violated rule 8 by foreclosing on their first trust deed, thereby becoming owners of the real property. The local committee recommended that petitioners "be subjected to a private reprimand." The Board concluded that petitioners had violated rule 4 only and resolved that each petitioner "hereby is privately reproved."

Although the Board did not expressly adopt the facts as found by the local committee, it restated them in substantially the same form. The facts as disclosed by the findings of the Board in substance are as follows: Russell H. Wilkinson, the complainant, and Navilla A. Wilkinson, his wife, sold to one Cantwell real property located in San Jose taking as part of the purchase price a promissory note of the buyer secured by a second deed of trust on the property. Claiming fraud in connection with the sale, the Wilkinsons employed petitioners who were partners in the practice of law in San Jose to represent them.[3]

---

[1]Rule 4 states, "A member of the State Bar shall not acquire an interest adverse to a client."

[2]Rule 8 states, "A member of the State Bar shall not directly or indirectly purchase property at a probate, foreclosure or judicial sale in an action or proceeding in which such member appears as attorney for a party."

[3]Although the findings are silent on the matter of the sale of the property, the record reveals that Wilkinson, who held an option to buy the subject property, agreed to convey his interest to Cantwell for $36,000. When Cantwell was unable to obtain a

About this time, Distefano, the holder of the first deed of trust, filed a notice of default and proceeded to have the property sold by the trustee. As attorneys for the Wilkinsons, petitioners filed a complaint against Distefano and others seeking damages and injunctive relief. A short time later, petitioners and the Wilkinsons agreed in writing that petitioners would purchase the promissory note and first deed of trust held by Distefano. The agreement also gave the Wilkinsons a "reasonable time within which to repay Bean and Ames for the monies they . . . [would expend] in purchasing the note, together with the additional sum of $3,000 required to be paid Bean and Ames as a consideration for buying the first deed of trust from Distefano." Additionally, it was agreed that petitioners "would be free to proceed to sell the property under the powers of the deed of trust so as to eliminate junior liens and encumbrances."

Pursuant to this agreement and while the Wilkinsons' civil action was still pending, petitioners purchased the note and first deed of trust held by Distefano for approximately $20,000. The Board found that this was done to give the Wilkinsons "more time to raise sufficient monies to protect [their] interests in the property"[4] and that petitioners "were acting in what they thought were the best interests of their client[s] and had no intent to deceive, defraud or otherwise oppress their client[s]." It further found that "after adequate and reasonable time had expired following the purchase of the note and deed of trust by Bean and Ames, Wilkinson having been unable to raise money sufficient to purchase the property from his attorneys, Bean and Ames did conduct a sale under the terms of the deed of trust and purchased the property at said sale. . . ."

Because of their foregoing acts, the Board concluded, petitioners "did violate Rule 4 of the Rules of Professional Conduct of the State Bar of California in that they willfully acquired an interest adverse to their client[s]."[5]

Petitioners' contentions may be summarized as follows: (1) that the

loan for the full purchase price, Wilkinson agreed to let Distefano (who had agreed to loan Cantwell the amount required for a down payment) take a first deed of trust on the property. Simultaneously, Wilkinson exercised his option to purchase, conveyed his interest to Cantwell, and received a down payment of $18,000 and a promissory note for the balance, secured by a second deed of trust. Subsequently, Cantwell defaulted in payments on the note secured by the first deed of trust and Distefano threatened foreclosure, as indicated in the findings.

[4]Petitioners assert that since the Wilkinsons' complaint was "unfounded," they would be unable to prevail in that part of the action that sought to prevent a foreclosure and sale of the first deed of trust. Therefore, they explain, it was necessary to acquire Distefano's senior security interest so that the Wilkinsons' junior security interest would not be rendered valueless by a foreclosure on the former's interest.

[5]As to petitioner Bean, nine members of the Board voted in favor of the action taken and two members disagreed (one on the basis that the discipline imposed is

findings of fact do not support the conclusion that they violated rule 4; (2) that rule 4 violates the due process and equal protection clauses of the United States Constitution; and (3) that the discipline imposed by the Board is improper.[6]

In support of their contention that the conclusion is not supported by the findings of fact, petitioners advance two arguments: First, that rule 4 does not express an absolute prohibition and therefore does not prohibit an attorney's acquisition of an interest adverse to his client when the transaction is fair and the attorney makes a full disclosure to, and obtains the consent of, his client; and second, that the first deed of trust acquired by petitioners was not an interest "adverse" in the ordinary sense of the word to the junior security interest held by their client.[7]

■ We conclude, contrary to petitioners' contention, that rule 4 is absolute in its terms and therefore forbids the purchase by an attorney of any "interest adverse to his client." It provides for no exceptions from its prescript, thus standing in contrast with other Rules of Professional Conduct which exclude from their reach acts of the attorney done with the consent of the client.[8]

We feel that our decision in *Eschwig* v. *State Bar* (1969) 1 Cal.3d 8 [81 Cal.Rptr. 352, 459 P.2d 904, 35 A.L.R.3d 662], throws light on the problem before us. There we dealt with rule 8 (see fn. 2, *ante*) which, like rule 4, proscribes certain conduct by a member of the bar without providing for any exceptions or qualifying conditions. Eschwig, attorney for the executrix of the will and surviving wife of one Handel whose estate was in probate, entered into an agreement, prepared by him, with Mrs. Handel, an aged and inexperienced woman. Under the agreement, the attorney

---

insufficient); as to petitioner Ames, ten members voted in favor of private reproval and one member voted in the negative.

[6]Petitioners also allege that the findings of fact are not supported by the evidence. However, they fail to develop this argument.

[7]Petitioners also argue that "attorneys are permitted to accept security from a client, including equitable interests in the client's property, for the payment of fees for future services," since Code of Civil Procedure section 1021 permits an attorney and his client to agree upon the "measure and mode of compensation." Apparently, this argument is directed to a finding made by the Board (not relevant in this proceeding) that petitioners obtained a security interest on other real property in which the Wilkinsons had an interest to secure the debt owed by them for legal services rendered by petitioners.

[8]See, e.g., rule 5: "A member . . . shall not accept employment adverse to a client . . . without the consent of the client . . . ."; rule 6: "A member . . . shall not accept professional employment without first disclosing his relation, if any, with the adverse party . . . ."; rule 7: "A member . . . shall not represent conflicting interests, except with the consent of all parties concerned."

promised, among other things, to support the widow for the balance of her life in exchange for a conveyance of land which was the primary asset of the estate. The conveyance was actually made outside of probate to the attorney's wife, also a party to the agreement, but without disclosure to the probate court and the requisite order confirming sale. Upon our review of a State Bar disciplinary proceeding thereafter initiated against Eschwig, we upheld the recommendation of the disciplinary board that he be disbarred. We there said: "An attorney representing the representative of an estate is under an obligation to seek the highest possible price on the sale of an estate asset. As a purchaser, however, he would be inclined to seek the lowest possible price. The resulting conflict of interest where the attorney becomes the purchaser is apparent. Because of the conflict of interest inherent in the situation, rule 8 is applicable even where an attorney is acting in good faith and even where there is competitive bidding." (1 Cal.3d at p. 15.)

As in *Eschwig* the transaction under review in the instant proceeding arose out of an agreement between an attorney and his client and therefore contained the ingredient of the client's consent. Similarly, as the Board found in the matter before us, the attorneys "were acting in what they thought were the best interests of their client[s] and had no intent to deceive, defraud or otherwise oppress their client[s]." These facts, however, do not place the transaction beyond the reach of the prohibition found in rule 4.

Some California decisions, including several cases cited by petitioners, have held that transactions between an attorney and his client, although presumptively invalid, are permissible where the attorney meets his burden of showing that he fully advised the client of his rights, that the transaction was fair, and that the consent of the client was obtained. (See, e.g., *Tomblin* v. *Hill* (1929) 206 Cal. 689, 694 [275 P. 941]; *Stieglitz* v. *Settle* (1917) 175 Cal. 131, 135 [165 P. 436]; *Fisher* v. *McInerney* (1902) 137 Cal. 28 [69 P. 622, 907]; *Valentine* v. *Stewart* (1860) 15 Cal. 387, 401; *Gold* v. *Greenwald* (1966) 247 Cal.App.2d 296, 306 [55 Cal.Rptr. 660]; *Sloan* v. *Stearns* (1955) 137 Cal.App.2d 289, 301 [290 P.2d 382]; *Hawkins* v. *Faries* (1942) 49 Cal.App.2d 186, 192-193 [121 P.2d 20].) These cases, however, did not involve the application of rule 4 in a disciplinary proceeding. They concerned the propriety of transactions between attorney and client giving rise to a civil action by the client to set aside the transaction or to a defense asserted by the client in an action by the attorney for his fees.[9] In the context of these cases, the standards governing the attor-

---

[9]*Valentine* v. *Stewart, supra,* 15 Cal. 387 (defense to action by attorney to enforce contract); *Fisher* v. *McInerney, supra,* 137 Cal. 28 (action to set aside conveyance of

ney's conduct were generally articulated in principles derived from the law of trusts. (*Trafton* v. *Youngblood* (1968) 69 Cal.2d 17, 27 [69 Cal.Rptr. 568, 442 P.2d 648]; *Tomblin* v. *Hill, supra,* 206 Cal. 689, 694.)

■ The Rules of Professional Conduct are intended not only to establish ethical standards for members of the bar (*Zitny* v. *State Bar* (1966) 64 Cal.2d 787, 793 [51 Cal.Rptr. 825, 415 P.2d 521]), but are also designed to protect the public. (*In re Rothrock* (1940) 16 Cal.2d 449, 454 [106 P.2d 907, 131 A.L.R. 226]; *Kennedy* v. *The State Bar* (1939) 13 Cal.2d 236, 240 [88 P.2d 920].) Accordingly we believe that, absent an express provision in the pertinent rule, it would be inconsistent with the purposes of the rules to conclude that the consent of the client or the fairness of the attorney-client transaction renders the rule inoperative.

■ On the other hand, it is obvious that rule 4 does not proscribe every business transaction engaged in by an attorney and his client. An essential element of the rule is that the interest acquired by an attorney be "adverse." Petitioners argue that by purchasing the note and first deed of trust from Distefano they did not acquire an interest adverse to their clients who held a note and second deed of trust on the same property unless the latter were in some way "injuriously affected." The term "adverse" is defined as "1: acting against or in a contrary direction . . . hostile, opposed, antagonistic . . . . 2a: in opposition to one's interests: detrimental, unfavorable . . . . 3: . . . 4 *law:* having opposing interests: having interests for preservation of which opposition is essential." (Webster's New Internat. Dict. (3d ed. 1963); see also 2 C.J.S., Adverse, pp. 634-635.)

The record before us reveals that Distefano, the holder of the first deed of trust, had filed a notice of default, and that Wilkinson, fearing that the second deed of trust held by him and his wife would be sold out, sought a loan from petitioners in order to pay off the senior encumbrance. Petitioners indicated that they did not desire to make a loan but that instead they themselves would purchase Distefano's note and deed of trust. Petitioners and the Wilkinsons then entered into a six-page formal agreement in writing, drawn by petitioners; we have already referred to this agreement. By the terms of this document, petitioners agreed to acquire the note and first deed of trust for $20,000 on the Wilkinsons' representation

property to attorney); *Stieglitz* v. *Settle, supra,* 175 Cal. 131 (defense to action by attorney for attorney's fees); *Tomblin* v. *Hill, supra,* 206 Cal. 689 (action to impose constructive trust on property acquired by attorney); *Hawkins* v. *Faries, supra,* 49 Cal.App.2d 186 (action against attorney for accounting of profits); *Sloan* v. *Stearns, supra,* 137 Cal.App.2d 289 (defense to action for attorney's fees); and *Gold* v. *Greenwald, supra,* 247 Cal.App.2d 296 (action by client to terminate an oral joint venture with attorney and for accounting of profits).

that the property was worth $35,000. The attorneys also agreed to defer any sale under the first deed of trust for approximately 110 days or until after a sale under the *second* deed of trust had occurred. One week after the sale under the second deed of trust, petitioners would be entitled to proceed with a sale under the first deed of trust. The Wilkinsons would then have not more than 15 days after such sale to purchase the property from petitioners for $23,000 plus the costs of the sale; at their option, they would be entitled to acquire at the same price the note and *first* deed of trust prior to the sale. If the Wilkinsons were unable to purchase on either basis, then petitioners would be free to sell the property to a third person but the Wilkinsons would be liable to the extent that such resale price was less than $23,000. To insure payment of the "deficiency," the Wilkinsons agreed to, and did, execute a promissory note in favor of petitioners for $23,000 secured by a second deed of trust on *other* real property which they owned.

Prior to the expiration of the stipulated 110-day deferral period, the parties modified the above agreement. The modification authorized a sale under the *first* trust deed before a sale under the *second* trust deed, but allowed the Wilkinsons 45 days within which to buy back the property. The net effect was that as compared with the original agreement, the Wilkinsons were allowed approximately nine days more to acquire the property from petitioners and the latter were to obtain a profit of $3,000 for having deferred the sale under the senior encumbrance for a period slightly less than three-and-one-half months. Petitioners ultimately acquired title to the property at the trustee's sale but the Wilkinsons were unable to purchase the property from them during the period provided by the agreement.

We think it is clear that petitioners' purchase of the note and first deed of trust constituted an acquisition of an interest adverse to their clients. Our conclusion proceeds from a consideration of the two deeds of trust on the same property in the light of the parties' collateral written agreement which governed the enforcement of each security interest. It is apparent that the Wilkinsons' interests could be best subserved by protecting the second deed of trust. The original collateral agreement, which provided for a sale under the first trust deed *after* a sale under Wilkinsons' second deed of trust, thus altering the inherently opposed nature of the two security documents, may be construed as promoting this objective. However, under the terms of the agreement, as modified, petitioners could proceed with a sale under their senior lien *first* and thereby extinguish the Wilkinsons' junior lien. In addition, under the terms of the agreement, the Wilkinsons were required to waive any claim to surplus proceeds from a sale under the first deed of trust to which they would be otherwise entitled

as holders of the second deed of trust. Consequently, the Wilkinsons' deed of trust was rendered valueless by petitioners' sale under the first deed of trust. ■ Petitioners violated rule 4, therefore, when they acquired a competing interest in land and proceeded to exercise the powers derived from their senior encumbrance, and pursuant to a collateral agreement drawn by petitioners designed in ultimate effect to protect their own interests, in a manner that defeated their clients' junior encumbrance.

Aside from the adverse nature of the two deeds of trust on the same property and the opposing interests of the parties in their collateral agreement, petitioners' acquisition of the first deed of trust also conflicted with the interests of their clients asserted in the pending civil action in which petitioners appeared as attorneys. Although the Wilkinsons had affirmed their sale of the property to Cantwell by seeking damages instead of rescission, they also prayed for an injunction to prevent the sale under the first deed of trust during the pendency of the action. Petitioners' acquisition of the first deed of trust and of the property itself at the subsequent trustee's sale occurred while the merits of this civil action were still undecided. They acquired, therefore, contrary to their duty of undivided loyalty to their client, an interest in the subject matter of the litigation. (See *McArthur* v. *Goodwin* (1916) 173 Cal. 499, 503 [160 P. 679]; *Webster* v. *King* (1867) 33 Cal. 348; 6 Cal.Jur.2d, Attorneys at Law, § 181, pp. 272-273.)

■ Petitioners argue, however, that the term "adverse" has been construed to mean "injuriously affect" (see *Sheffield* v. *State Bar* (1943) 22 Cal.2d 627, 631 [140 P.2d 376]), and that the absence of actual injury to their clients demonstrates that they did not violate rule 4. *Sheffield* construed the meaning of the term "adverse" in rule 5, which forbids "employment adverse to a client." (*Id.* at p. 630.) However, *Sheffield* did not state the narrow construction urged by petitioners. In fact, *Sheffield* approved the statement in *Galbraith* v. *The State Bar* (1933) 218 Cal. 329, 332-333 [23 P.2d 291], that the rule is violated "not merely when the attorney *will* be called upon to use confidential information obtained in the course of the former employment, but in every case when, by reason of such subsequent employment, he *may* be called upon to use such confidential information." (Italics in original.) The thrust of this statement suggests that while one of the objects of rule 5 is to prevent conduct by an attorney which "injuriously affect[s]" a client, its means of attainment require an attorney to avoid "circumstances . . . [which] might suggest or require that . . . [he] make use of information acquired by him . . . ." in representing another client (*Id.* at p. 333.) Consequently, injury to a client is

not an essential ingredient of adversity. Rather, it is merely one of the foreseeable though not inevitable consequences. Similarly, within the context of rule 4, an attorney must avoid circumstances where it is reasonably foreseeable that his acquisition may be detrimental, i.e., adverse, to the interests of his client.

In summary, we conclude that petitioners' conduct constituted a violation of rule 4. ■ We reach this conclusion because we think that rule 4 "is designed not alone to prevent the dishonest practitioner from fraudulent conduct, but as well to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests . . . ."[10]

We turn next to petitioners' contention that rule 4 violates the due process clause of the Fourteenth Amendment. They explain that the rule is impermissibly vague in that it does not adequately inform them of the standards by which they are to be judged. Petitioners' reliance upon our decision in *In re Blaney* (1947) 30 Cal.2d 643 [184 P.2d 892] is misplaced. That case involved a statutory enactment in the Labor Code found to be "too sweeping, vague, and uncertain" (*Blaney,* at p. 650) and violative of freedom of speech. No claim of infringement of a First Amendment freedom is made here. ■ Moreover, it cannot be said that rule 4, forbidding the purchase by an attorney of an "interest adverse to his client," given its ordinary meaning, is impermissibly vague.

■ Additionally, petitioners assert that rule 4 is overinclusive and violative of the equal protection clause of the Fourteenth Amendment (see *Keenan* v. *Board of Law Examiners of State of N.C.* (E.D.N.C. 1970) 317 F.Supp. 1350); that is, it forbids acquiring an adverse interest even where no harm results to the client. Explaining the purpose of the Rules of Professional Conduct, we said in *Zitny* v. *State Bar, supra,* 64 Cal.2d 787, 792-793, " 'The controlling question, . . . is not whether any harm or damage resulted to the particular clients from petitioner's handling of their affairs. . . .' The rules are designed to establish ethical standards for the Bar and to 'prohibit unprofessional conduct.' [Citations.]" Therefore, since the purpose of rule 4 is broader than protecting the interests of clients, the fact that Wilkinson may have suffered no harm does not require the conclusion that the rule is overinclusive.

---

[10]See *Anderson* v. *Eaton* (1930) 211 Cal. 113, 116 [293 P. 788], which explains the policies supporting the rules forbidding adverse employment and the representation of conflicting interests.

Finally, petitioners contend that the discipline imposed, private reproval, is improper. The disciplinary power of the Board consists of the imposition of reproval, public or private, or the recommendation of disbarment or suspension (Bus. & Prof. Code, §§ 6077, 6078; Rules of Procedure of the State Bar of California, rule 42), subject to review by this court (Bus. & Prof. Code, § 6082). ■ We explained in *Bernstein* v. *State Bar* (1972) 6 Cal.3d 909, 919 [101 Cal.Rptr. 369, 495 P.2d 1289], that "[t]he imposition of . . . [discipline] does not issue from a fixed formula but from a balanced consideration of the revelant factors." These factors include not only the conduct constituting a violation of the rules by an attorney as well as any incidents of prior misconduct, but also include the effect of the attorney's conduct on other parties. (*Id.* at pp. 918-919.)

■ In the instant case, there is no record of prior misconduct of any kind. Although we conclude that petitioners wilfully violated rule 4 by acquiring an interest adverse to their clients, we are mindful of the factors that the transaction involved was engaged in purportedly with the consent of the clients and that, as the Board found, petitioners "were acting in what they thought were the best interests of their client[s] and had no intent to deceive, defraud or otherwise oppress their client[s]." Nevertheless, these mitigating factors cannot wholly dissolve the violation of the rule which proscribes such conduct even when engaged in under such circumstances because of its potential risk of harm to clients and its erosion of the highest standards of loyalty demanded of members of the bar. In view of these factors, it would appear that the Board's imposition of the least severe penalty—private reproval—gave recognition not only to the underlying violation of rule 4, but also to the mitigating circumstances in which the violation occurred.

We conclude that the discipline of private reproval imposed on petitioners by the Disciplinary Board is justified.